**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **IN RE** | **NO. 09-10176** |
| **DAVID LANDRIEU** | |
| | **SECTION "A"** |
| **DEBTOR** | **CHAPTER 7** |

| | |
|---|---|
| **PATRICIA DICORTE** | **ADV. NO. 09-1044** |
| **V.** | |
| **DAVID LANDRIEU** | |

**MEMORANDUM OPINION**

On April 21, 2009, Patricia DiCorte ("DiCorte") filed a Complaint Objecting to Discharge of Debtor's Indebtedness ("Complaint").[1]  David Landrieu ("Debtor") contested the Complaint.[2] Trial on the merits of the Complaint was held on November 12, 2009, after which the Court took the matter under advisement.

I.      **FACTS**

On August 29, 2005, Hurricane Katrina caused damage to DiCorte's home.  In 2006, DiCorte contacted Glenn Mastio ("Mastio"), an employee of Construction Services Associates

---

[1]  P-1.

[2]  P-2.

1

("CSA"), with the intention of hiring CSA or Debtor to repair her home.[3]  CSA is a company co-owned by the Debtor and Paul DiBennedetto ("DiBennedetto").[4]

Before signing a contract, DiCorte contacted the Louisiana Contractor's Licensing Board ("Licensing Board") to confirm that CSA or Debtor held sufficient qualifications for the job.  She obtained a copy of a license, verified that the license was in good standing and confirmed that it entitled the holder to perform the work on her home.[5]  DiCorte received copies of  workers' compensation and liability insurance policies as well.[6]  She also scrutinized CSA's work by inspecting the home of a previous customer, Rita LaGrange.[7]

On May 31, 2006, CSA submitted an estimate for work on DiCorte's home ("Estimate").  The Estimate provides:

> Hip roof built over flat roof in rear.  Repair chimney flue cap and re-mortar.  Remove, replace, and paint soffit and fascia – rear elevation.  Remove aluminum siding and replace with plywood sheating and vinyl siding.  Demo all walls and bathrooms except living room.  Install insulation on all outside walls.  Install dry wall (tape, float, ready for paint).  Paint all ceilings and walls.  Replace and paint all base moldings.  Paint all doors and windows including trim.  Remove and replace bathtubs (2) with faucets.  Remove and replace tub surrounds (2) with cultured marble.  Detach, reset, and rebuild toilets (2).  Detach and reset pedestal sink with faucet (1).  Install bath vanity with top and faucet.  Remove and replace all kitchen countertops and cabinets ($11,000 allowance).  Install small kitchen island with cabinets and formica countertop.  Install kitchen sink with faucet.  Remove and replace wood floors

---

[3] Trial testimony ("T.T."), DiCorte.  DiCorte's testimony was unclear as to who she intended to hire, CSA or Debtor.

[4] T.T., Debtor.

[5] T.T., DiCorte.  DiCorte's testimony was inexact, referring to "his" license.  A copy of the license obtained from the Licensing Board was not introduced into evidence.

[6] T.T., DiCorte.  Neither documents evidencing insurance coverage nor cancellation were introduced into evidence.

[7] T.T., DiCorte.

(oak). Sand, stain, and finish wood floors. Remove and replace ceramic tile in baths and kitchen. Remove and replace water heater. Remove and replace AC unit. Plumbing to include replacing any damaged pipes/valves, installation of appliances bought by owner. Electrical to include re-wire to code, remove and replace circuit box, and receptacles. Treat with anti microbial (microban). Install owner bought glass door between dining room and kitchen.

The estimated total cost to complete the work was $148,137.00.[8]

On July 7, 2006, DiCorte and Mastio signed a Contractor Agreement ("Agreement") to "remodel house to scope of work outlined in estimate." The Agreement was on a CSA form that contained the heading "CSA *General Contractors*."[9]

The contract price was $148,137.00, payable in progress payments:

| | |
|---|---|
| 20% deposit on contract signing | $29,627.00 |
| 20% on completion of demo, insulation, rough-in plumbing and electric | $29,627.00 |
| 20% on completion of roof, siding, dry wall installation | $29,627.00 |
| 20% on completion of painting, doors/trim, AC, bath/plumbing trim out | $29,627.00 |
| 20% on completion of floors, kitchen, electric, punch list | $29,629.00 |
| TOTAL | $148,137.00[10] |

Work commenced on the house in August 2006. DiCorte paid three of the five installments outlined in the Agreement. However, on December 15, 2006, DiCorte ordered Debtor off of her property when she discovered that Debtor's workers' compensation insurance had lapsed on November 30, 2006.[11]

---

[8] Exh.8.

[9] Exh.1.

[10] Exh.1.

[11] T.T., DiCorte.

In January 2007, after the parties could not reach an agreement that would allow Debtor to complete the job, DiCorte complained to the Better Business Bureau ("BBB"), District Attorney's Office for Orleans Parish, and Louisiana Attorney General Contractor Fraud Unit. DiCorte also reported CSA and Debtor to the contractor fraud division of the Federal Bureau of Investigation, the United States Attorney for the Eastern District of Louisiana and the Louisiana State Board of Contractors.[12]

Ultimately, DiCorte's claims were heard in an arbitration on July 10, 2007.[13] On July 13, 2007, the arbitrator cast CSA and Debtor in judgment for $219,285.00 ("Arbitration Award").[14] Thereafter, Debtor and CSA challenged the Arbitration Award in the Civil District Court for the Parish of Orleans, State of Louisiana ("District Court"). Although the District Court originally vacated the arbitrator's ruling, DiCorte's appeal of that decision was reversed by the Louisiana Fourth Circuit Court of Appeal ("Appeals Court"). As part of the reversal, the Appeals Court reinstated the Arbitration Award against CSA and Debtor and rendered judgment in DiCorte's favor for $219,285.00, with interest from the date of judicial demand at the legal rate until paid and all costs of the proceedings.[15]

---

[12] T.T,, DiCorte.

[13] Exh.11.

[14] Exh.2. Because the arbitrator concluded that the legal status of CSA was unclear, both CSA and Debtor were cast in judgment.

[15] *DiCorte v. Landrieu, et al*, No. 2008-CA-0249, September 10, 2008.

On January 22, 2009, Debtor filed a voluntary petition for relief under Chapter 7. DiCorte's Complaint followed. The Complaint alleges that the Arbitration Award should be excepted from discharge pursuit to 11 U.S.C. §§ 523(a)(2), (4) and (6).[16]

## II.    LAW AND ANALYSIS

As noted in the opinion of the Appeals Court, the Arbitration Award is binding on the parties. This Court is not called upon, nor does it have the authority to question, the propriety of the underlying Arbitration Award. Instead, the Court's role is narrow, limited to a determination regarding whether or not the damages awarded in Arbitration are dischargeable.

The United States Court of Appeal for the Fifth Circuit and United States Supreme Court have agreed "that a bankruptcy court faced with a claim of non-dischargeability...presented with a state court judgment evidencing a debt is not bound by the judgment and is not barred by *res judicata* or collateral estoppel from conducting its own inquiry into the *character* and, ultimately, the dischargeability of the debt.[17] Thus, a state court may, as part of its findings, determine the nature or basis for liability, a bankruptcy court is free to determine the character of the debt even if that determination is at odds with the prior court's ruling.

In *Brown v Felsen*, the United States Supreme Court held:

[T]he bankruptcy court is not confined to a review of the judgment and record in the prior state-court proceedings when considering the dischargeability of respondent's debt. Adopting the rule respondent urges would take ... issues out of the bankruptcy courts well suited to adjudicate them, and force those issues onto state courts concerned with other matters, all for the sake of a repose the

---

[16] P-1.

[17] *Carey Lumber Co. v. Bell*, 615 F.2d 370, 377 (5th Cir. 1980). *Emphasis supplied.*

bankruptcy has long since abandoned.  This we decline to do. *Brown v. Felsen*, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979).[18]

A.  11 U.S.C. §523(a)(2)(A)

Section 523(a)(2)(A) excepts from discharge debts "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." [19]  The burden of proof rests with the plaintiff who must establish her case by a preponderance of the evidence.[20]  Any statutory limits on dischargeability are construed strictly against those seeking nondischargeability of their claims.[21]

A finding of nondischargeability under §523(a)(2)(A) requires proof of intention to commit a deception.  The validity of DiCorte's claims requires strict proof of who made the alleged misrepresentations, false pretenses, or actual acts of fraud because fraud can not be imputed to another by mere association.[22]  At trial, DiCorte based her claims of nondischargeability on the statements or conduct of Debtor, CSA or Mastio.  Generally, the conduct of Mastio or CSA would not be attributable to Debtor, unless, the fraudulent representations were made by a formal partner or agent with Debtor's knowledge or benefit.[23]

---

[18]  *See also, Grogan v. Garner*, 498 U.S. 279, 284, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

[19]  11 U.S.C. §523(a)(2)(A).

[20]  *In re Allison*, 960 F.2d at 483 citing *Grogan v. Garner*, 498 U.S. 279 (1991).

[21]  *In re Souileau*, 488 F.3d 302 (5th Cir. 2007)

[22]   *Owens v. Miller*, 276 F.3d 424, 429 (8th Cir. 2002)

[23]  *In re Quinlivan*, 434 F.3d 314, 319 (5th Cir. 2005).

Additionally, while acts of  fraud, false pretense or false representation seem interchangeable, they are actually distinct forms of deception.  False representations or false pretenses are statements that falsely depict current or past acts.  Actual fraud occurs when a debtor makes a promise regarding future action, which at the time, he had no intention of fulfilling.[24]

The distinctions are not without effect as the various types of deception have differing elements of proof.[25]  To establish a "false pretenses" or a "false representation" exception to discharge, a plaintiff must prove: (1) a knowing and fraudulent falsehood, (2) describing past or current facts, (3) that was relied upon by the aggrieved party.[26]  Alternatively, actual fraud requires proof of: (1) representations; (2) made at a time when the debtor knew they were false; (3) with the intention and purpose to deceive the aggrieved party; (4) that were relied upon; and (5) proximately caused the sustained losses.[27]

Reviewing DiCorte's evidence, she alleges that through false statements or conduct, Noel's Plumbing, L.L.C. filed a lien against her home.  DiCorte also complains that Debtor or CSA misrepresented their qualifications to perform the job.  Finally, she complains that Debtor received funds for the third installment under the Agreement as a result of a false misrepresentation or actual fraud.

---

[24] *Kleppinger v. Rollins*, 2007 WL 2319778, at *4 (Bkrtcy. E.D. La. 2007).

[25] *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995).

[26] *Id.* at 1293; *Allison*, *supra*, at 483.

[27] *RecoverEdge, L.P.*, *supra*.

1.  Lien by Noel's Plumbing

In February 2007, Noel's Plumbing placed a lien on DiCorte's home when an outstanding invoice for $2,500.00 was not timely satisfied by CSA.  Debtor testified that CSA's failure to pay the bill was an oversight and when he became aware of the lien, the debt was discharged.[28]  Debtor offered a Release of All Claims and Lien Rights as evidence of the cancellation of the lien and satisfaction of the claim it secured.[29]

The filing of a lien by Noel's Plumbing does not constitute a false pretense or representation by Debtor.  DiCorte failed to introduce any evidence to support her assertions that Debtor misrepresented payment to Noel's Plumbing or any other subcontractor.  In fact, DiCorte offered no proof whatsoever that any representation, knowing or unknowing, was made to her regarding payments to subcontractors or the existence of outstanding debts.  DiCorte's failure of proof also extends to her claims of actual fraud.   Without an affirmative representation that subcontractor claims were paid, DiCorte's Complaint states a claim for simple breach of contract.  Further, since all liens were satisfied when brought to the attention of Debtor, DiCorte failed to establish that any damage resulted from the filing of the Noel's Plumbing lien.[30]

---

[28]  T.T., Debtor.

[29]  Exh. 10.

[30]  The lien was released prior to arbitration.  As a result, the Arbitration Award did not include the amounts due to Noel's Plumbing, nor did it award damages as a result of the filing of the lien.

8

2. CSA/ Debtor Qualifications

DiCorte complains that CSA or Debtor misrepresented their qualifications to perform the work required under the Agreement. The basis for her claim is threefold. First, DiCorte alleges that Debtor or CSA misrepresented that one or the other held a general contractor's license. Second, DiCorte complains that Debtor lacked the requisite skill to do the job and represented to the contrary. Finally, DiCorte avers that Debtor failed to maintain  workers' compensation insurance during the course of her job.[31]

a. Misrepresentations as to Licensing

When DiCorte first contacted CSA regarding her job, Mastio was the face of the company. Mastio met with DiCorte, inspected her home, prepared and presented the Estimate, and signed the Agreement on behalf of CSA. The Agreement was prepared on CSA's forms which indicated that CSA was a "general contractor."[32]

Prior to signing the Agreement, DiCorte received  a copy of a license from the Licensing Board.[33] She also  verified with the Licensing Board that the provided license was in good standing and appropriate for the job contemplated by the Agreement.[34]

---

[31] As previously noted, neither a copy of the declaration page nor the notice of termination was introduced into evidence.

[32] T.T., Debtor; Exh. 1

[33] T.T., DiCorte.  A copy of the "license" DiCorte obtained from the Licensing Board was not filed into evidence.

[34] T.T., DiCorte.

Dicorte failed to present a copy of the license she received.  As a result, the Court can not determine if it was a general contractor's license or some other form of license.  Not only is the form of license indeterminable, but the holder of the license is also unclear. What is evident, is that numerous governmental agencies responsible for investigating contractor fraud claims in the aftermath of Hurricane Katrina, including the contractor fraud division of the Federal Bureau of Investigation, the United States Attorney, the Louisiana State Board of Contractors and the Louisiana Attorney General, reviewed DiCorte's complaints, including those regarding licensing. None of the foregoing agencies found any insufficiency in licensing.  This is consistent with the Licensing Board's confirmation to DiCorte that the license supplied was sufficient for the job.

Having failed to establish that CSA lacked a license, or that the license provided was fraudulent or insufficient, DiCorte next alleges that whatever was produced by the Licensing Board was not a general contractor's license.  DiCorte then argues, that regardless of the actual license's sufficiency, the fact that CSA's forms represented it to be a 'general contractor' was a falsehood and renders the Arbitration Award nondischargeable.

Putting aside the issue that no one established or refuted CSA's licensing status, the Court finds that CSA's respresentations regarding same do not render the debt  nondischargeable.  The only statements made by CSA to DiCorte on the subject are on its forms.  Those forms hold CSA out as a "general contractor."  In some contexts, this representation, if false, could lead to a finding of nondischargeability.  However, in this case, the other elements of nondischargeability are absent.

Reliance is an essential element of nondischargeability.[35]  DiCorte admitted that she independently verified licensing status and the sufficiency of the license for the work involved *prior* to signing the Agreement. Thus, whether or not CSA was a general contractor as it represented itself to be, the record established that DiCorte *did not rely* on CSA's form representation regarding its status as a general contractor.   In fact, DiCorte failed to establish that she relied on *any* representations by CSA, Debtor or Mastio regarding CSA's license.

DiCorte offered no evidence regarding Debtor's personal, professional qualifications, nor did she provide any statements or representations made by him regarding same.   Debtor testified that he individually held a "remodeler's license."   Under the applicable provisions of Louisiana law in effect in July 2006, "home improvement contractors" were allowed to undertake residential construction work without a general contracting license with certificate of registration issued by the Residential Building Contractors Subcommittee of the Licensing Board.[36]  The Court finds that Debtor held a home improvement registration and did not misrepresent his professional credentials. Finally, as explained below, DiCorte did not prove any casual connection between her allegations and her losses.

b. Misrepresentations Regarding Debtor's Abilities

DiCorte complains that separate and apart from the question of licensing, Debtor lacked the requisite level of skill to perform her job. DiCorte offered no evidence of Debtor's misrepresentations as to skill.  She relies heavily on his work product as evidence that he was unqualified and incapable of performing the Agreement. From this allegation she infers a

---

[35]  *Field v. Mans,* 516 U.S. 59, 74-5, 116 S.Ct. 437, 133 L.Ed 2d 351 (1995).

[36]  La. R.S. 37:2175.1 and 2175.2.  The statutes were amended in 2007 to limit the scope of residential construction work under a home improvement registration to jobs requiring no more than $75,000.00 in work.

misrepresentation or fraud by Debtor regarding his abilities.

In support of her allegations, DiCorte testified that a pair of french doors were installed backwards; several interior light fixtures were lost or broken during construction despite assurances that they would be saved; existing interior doors and mouldings were removed during the construction process and stacked in her garage without marking their origin; electrical outlets were installed in her baseboards rather than on the walls; an electrical box on the outside of her house was not changed; wires were hanging from places where she did not believe they should be; no garage doors were installed, and the sheetrocking was not finished.

In response, Debtor explained that the french doors were in-swinging and confirmed that DiCorte requested doors that would swing out onto her deck. Debtor testified that Lowe's delivered the wrong doors to the jobsite. When the problem was discovered, out-swinging doors were ordered but because they were a special order item, their delivery was delayed. Debtor installed the standard in swinging french doors until the special order doors arrived.[37] The doors and mouldings might not have been stored in a fashion acceptable to DiCorte, but she articulated no loss as a result of Debtor's method.[38]

Similarly, the loss of two light fixtures, while unfortunate, did not appear, from the evidence submitted to be substantial.[39] DiCorte did not represent that they were unique, especially valuable, or difficult to replace.

---

[37] T.T., Debtor. The out-swinging doors had not arrived prior to December 15, 2006 when DiCorte ordered Debtor off of her property.

[38] T.T., DiCorte.

[39] Exh. 2. The Arbitration Award reflects $3,000 for lost or damaged light fixtures.

12

Some of DiCorte's complaints were refuted by her own witness.[40]  Most of DiCorte's other complaints were cosmetic in nature and subject to variances in taste.  For example, the placement of electric outlets in baseboards is acceptable, even preferable to many homeowners. DiCorte's complaints regarding the positioning of duct work were also cosmetic and corrected by Debtor when she complained.[41]

The bulk of the Arbitration Award is for damages based on the cost to complete DiCorte's job, not remedy the work already performed.[42]  As previously discussed, DiCorte refused to allow CSA or Debtor to complete the job when proof of workers' compensation insurance could not be produced.  This forced her to obtain another contractor who eventually completed the job.  At the time of arbitration, DiCorte had a contractor estimate what it would cost for a third party to complete her job.  The estimate was much higher than CSA's commitment and understandably raised the level of damages awarded.  However, these damages are mere breach of contract claims, not damages for fraud.[43]

The record at trial also established that DiCorte's mortgage company was sending independent inspectors to the home on a regular basis and prior to the release of progress payments

---

[40]  DiBennedetto testified that all sheetrock was in place when he inspected the property for Debtor.  *Infra,* at 17.

[41]  T.T., Debtor

[42]  The Arbitration Award reflects approximately $178,735.00 in damages to complete the job.  Only a small amount, approximately $14,000.00 was awarded for "defective work."  DiCorte's light fixture claim is included in that figure**.**  Other damages awarded were for loss of use of the property for failure to complete the work ($14,000.00) and prospective loss of use ($12,000.00).

[43]  In actuality, DiCorte testified that she spent approximately $178,000.00 to renovate her home, including the amounts paid to CSA.  Since the total contract amount with CSA was $148,137.00, DiCorte actually suffered less than $30,000.00 in breach of contract claims, not the $219,285.00 awarded.

under the Agreement.    Although DiCorte complained about shoddy and unacceptable work, no

complaints were voiced by her mortgage company who continued to forward progress payments

without reservation.

DiCorte simply failed to establish that Debtor lacked the necessary qualifications or skill

to perform her job. Many of the problems she described at trial with her job were minor, some were

remedied prior to Debtor's termination, and others were left uncorrected when the job was abruptly

terminated.    None, however, rise to the level of fraud.    For these reasons the Court finds that

Debtor possessed the requisite skill to perform the work in question and did not misrepresent or

falsify his qualifications.

c. Misrepresentations as to Insurance

DiCorte also alleges that Debtor failed to maintain workers' compensation insurance

during the course of her job and that Debtor misrepresented this fact to her.  Both parties agree that

at the start of work, a workers' compensation policy was in effect.

In December 2006, DiCorte received a notice of cancellation for the workers'

compensation policy.  She immediately demanded confirmation from Debtor that a valid policy was

in existence.  When no proof of insurance was given, she ordered Debtor off of her property. At

trial, Debtor had various explanations as to why the cancellation was sent.   He testified that he

renewed his insurance and that he assumed that the renewal notice had been sent to DiCorte.

Debtor also testified that he sent a copy of the insurance renewal to the Attorney General.

Regardless of whether or not Debtor possessed workers' compensation insurance, Debtor failed to

produce proof of insurance to DiCorte.  As a result, Debtor was not allowed to complete the job.

Paragraph 7 of the General Provisions attached to the Agreement provide that "Contractor

14

warrants it is adequately insured for injury to its employees and others incurring loss or injury as a result of the acts of Contractor or its employees or subcontractors."[44]  While Debtor offered excuses for his failure to produce proof of insurance to DiCorte, he did not provide her with that proof.   Based on the evidence submitted, the Court concludes that DiCorte was justified in terminating the Agreement for breach of contract.[45]

Nevertheless, Debtor's failure to provide proof of insurance does not give rise to nondischargeability because DiCorte did not rely on the existence of insurance after it lapsed.  After receiving the notice of cancellation, DiCorte immediately ordered Debtor off her jobsite and forbid his return.   She confirmed this directive by a certified letter to Debtor and CSA, erected a 'No Trespassing' sign,  and changed the locks on her home.[46]  Because DiCorte  immediately acted to protect herself from potential claims by refusing access to her property, the Court finds that DiCorte did not rely on any statement concerning continued coverage but demanded independent proof.

Debtor's failure to supply satisfactory proof of insurance resulted in a breach of contract claim.  As a result of that breach, he and CSA were refused access to the job site and ultimately found liable for damages.   Breach of contract is not the equivalent of fraud or misrepresentation and Debtor has failed to carry her burden of proof on either by a preponderance of the evidence.

---

[44]   Exh.1.

[45]   In addition to breaching the Agreement, La.R.S. 23:1168 (2009) was violated if proper insurance was not maintained.

[46] T.T., DiCorte.

As Louisiana courts have so often reminded, not every garden variety breach of contract is fraud.[47]

### 3.   CSA's Receipt of Payment Prior to Completion of Work

When DiCorte's home was damaged by Hurricane Katrina, homeowner's and flood insurance proceeds, along with a Small Business Administration loan, were used to fund repairs.[48] Because it claimed a security interest in DiCorte's insurance proceeds, her mortgage company held all insurance funds in an escrow account, releasing progress payments only after inspecting the work performed.

In late October or early November of 2006, DiCorte's mortgage company sent an inspector to her home.  The inspector authorized the third release of funds after confirming that the work was satisfactory.  The third installment payment, equal to twenty percent (20%) of the total contract price or $29,627.00 was due "on completion of roof, siding, dry wall installation."[49] When the funds were released, the dry wall and siding had been installed.  The roof had been framed, decked, waterproofed, and tarped.   However, shingles were not in place.

Debtor admitted that at the time the third installment was paid, the roof lacked shingles. Debtor claimed shingles had been ordered, but due to a mistake, the wrong product was delivered. He testified that he believed the subcontractor responsible for the roof had reordered the shingles at the time he requested payment.

DiCorte avers that she consented to payment of the third installment despite the fact that

---

[47] *Gamble v. Carter*, 378 So.2d 185, 186 (La. App. 1979) (An unfulfilled promise, without an intention not to fulfill it at the time it is made, is merely a breach of contract.); *Swann v. Magouirk*, 157 So.2d 749, 751 (La. App. 1963); *Green v. La. Hwy. Com'n*, 3 So.3d 236, 238-239 (La. App. 1 Cir. 1941).

[48]   T.T., DiCorte.

[49]   Exh. 1.

the roof was not complete because she believed the shingles were on backorder. She argues that Debtor misrepresented this fact and had she known that the shingles were not ordered, she would not have consented to payment. Because Debtor was ordered off the property shortly thereafter, DiCorte did not receive the shingles or the value of the labor to install them.[50]

DiBennedetto, a former business partner of Debtor, testified on behalf of DiCorte. DiBennedetto's testimony regarding the status of the work supported Debtor's own testimony. In essence, they agreed that the roof had been fully decked, framed and waterproofed, but the shingles were not installed. DiBennedetto also noted that the sheetrock and siding were in place. With regard to the shingles, DiBennedetto represented that Debtor admitted to him that the special roofing tiles for the DiCorte house had not been ordered.

Arguably, if at the time the third progress payment was made, Debtor misrepresented that the tiles were on backorder so as to receive the payment in advance of stage completion, a portion of DiCorte's claim could be nondischargeable. However, DiBennedetto could not remember the specific date of his conversation with Debtor. As such, the Court can not determine if the conversation occurred before or after the third progress payment. Given the record, it is entirely plausible that Debtor learned of his subcontractor's failure to order the tiles after the payment was made and therefore did not misrepresent the facts to DiCorte. "An honest belief, even if unreasonable, that a representation is true and that the speaker has information to justify it does not amount to an intent to deceive."[51] Whatever the reason for Debtor's failure to supply tiles to the DiCorte house, DiCorte failed to meet her burden of proof that Debtor obtained the third progress

---

[50] T.T., Debtor. Debtor testified that the shingles would cost $2,000.00.

[51] *Port Louis Owners Assoc., Inc. v. Savage*, 366 B.R. 574, 583 (Bktcy. E.D. La. 2007), citing *Palmacci v. Umpierrez*, 121 F.3d 781, 788 (1st Cir. 1997).

payment through a knowing misrepresentation.[52]

DiCorte also alleges that the third progress payment was obtained by fraud. To establish fraud, DiCorte must prove that at the time the third progress payment was made, Debtor had no intention of performing under the Agreement.

If a debtor makes a promise of future action that he has no intention of fulfilling, the debt may be nondischargeable.[53] Debtor's conduct following the dispute with DiCorte refutes her allegations. Roughly three months after being banned from the property, Debtor sent a letter to DiCorte on CSA stationary dated March 21, 2007. It reads:

> This letter is to confirm our conversation on Tuesday, March 13, 2007. As previously discussed, I am willing to finish the remaining work on your home. The following is the list of work, the percentage completed, and the associated cost of the work performed at 808 Weiblen...
>
> *                    *                    *
>
> The grand total of $117,645.00 represents the value of the work done at your property. Per our conversation, it is my understanding that you are seeking another contractor to complete your project. If you would like me to finish your project, please contact me as soon as possible.[54]

On April 22, 2007, Debtor sent another letter to DiCorte on CSA stationary *via* her attorney. It stated:

> I received a phone call from your lawyer asking about your case in this matter. I informed him that I mailed you a letter explaining my position and he said he did not see or here (sic) about any communications between us, therefore I am

---

[52] *See also, Rishell v. Davis*, 115 B.R. 346 (Bankr. N.D. Fla. 1990) ("sufficient evidence was not given to prove that Davis knew his representations on the December 7 affidavit were false, or that he made those representations with the purpose or knowledge that such would injure the plaintiffs.")

[53] *McBrier v. McDaniel*, 368 B.R. 515, 519 (Bktcy. M.D. La. 2007); *Kleppinger v. Rollins*, 2007 WL 2319778 at *4 (Bkrtcy. E.D. La. 2007)

[54] Exh. 3.

sending the letter again by certified mail.  He also stated he would recommend for you to call me to complete your job.  Since I have not heard from you, I assume you have found someone to complete your job. [55]

On May 22, 2007, Debtor signed an Agreement to Arbitrate requesting a  release from liability or alternatively, stating that he would complete the contract if an escrow supervised payment system was put into place.[56]

The two letters from Debtor to DiCorte, coupled with the Debtor's testimony at trial and his notes to the arbitrator, lead to the conclusion that Debtor intended and desired to complete the project.   Debtor also took steps in keeping with that intention when he attempted to prevent the roof from leaking while waiting for the special order shingles to arrive.  The Court finds that Debtor intended to complete the job, including putting the shingles on the roof, and Debtor's actions in this case did not rise to the level of fraud.

In conclusion, the Court finds that any claims DiCorte had against Debtor arose out of breach of contract, not fraud or misrepresentations.  The Court also finds, with the exception of CSA's form representation as a "general contractor,"   no evidentiary support that Debtor knowingly committed any acts that can be characterized as false pretenses, false representations or actual fraud.  With regard to CSA's form statement regarding its status as a general contractor, the Court finds that DiCorte did not rely on the representation and failed to establish any casual connection between it and her damages.

---

[55]  Exh. 12.

[56]  Exh.11.

B.  11 U.S.C. §523(a)(4)

DiCorte has also alleged that the Arbitration Award is not dischargeable under 11 U.S.C. § 523(a)(4).   Section 523(a)(4) prohibits a discharge of a debt incurred as a result of " fraud and defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

The term "fiduciary" is narrowly defined for purposes of Section 523(a)(4).  The term applies only to technical or express trusts, which did not exist in this case.[57]  Therefore, the record does not support that Debtor was a fiduciary of DiCorte.

Embezzlement is "fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come."[58]   The fraudulent appropriation must be "of another's property."[59]  Larceny is the equivalent of theft.  Debtor neither held funds for DiCorte nor had control or signatory authority over the funds he received.  Debtor simply received a voluntary payment from Debtor.  In hindsight, DiCorte may now believe that the third progress payment was improvident or unwarranted, but it was voluntary.  Allegations of embezzlement or larceny are not well placed.

Therefore, the Court finds that DiCorte did not provide any evidence that Debtor engaged in fraud or defalcation while acting in a fiduciary capacity, embezzled funds or committed larceny.

C.  11 U.S.C. §523(a)(6)

Section 523(a)(6) exempts debts "for willful and malicious injury by the debtor to another entity or to the property of another entity."  In order for DiCorte to prove a "willful" injury, she

---

[57] *Angelle v. Reede,* 610 F.2d 1335, 1341 (5th Cir. 1980); *In re Moran*, 413 B.R. 168 (Bkrtcy. D.Del. 2009).

[58] *Matter of Miller*, 156 F.3d 598, 602 (5th Cir. 1998).

[59] *In re Davenport*, 353 B.R. 150, 199 (Bankr. S.D. Tex. 2006).

must show by a preponderance of the evidence that Debtor possessed an intent to do DiCorte harm. The intent may be (1) an objective substantial certainty of harm; or (2) a subjective motive to cause harm, [60] but it must be purposeful, not simply negligent.  Said differently, "the debtor must commit an intentional or substantially certain injury in order to be deprived of a discharge."[61]   The actions of Debtor must also be "malicious."  In order for an act to be "malicious" within the meaning of section 523(a)(6), it must have been without legal justification or excuse.[62]

DiCorte did not provide any testimony or evidence at trial to prove that Debtor's actions were willful or malicious.  The Arbitration Award characterized only a small part of the damages as "defective" or negligent.  DiCorte offered nothing further to support her claim of an intentional tort.  As such, the Court finds that section 523(a)(6) does not render the debt to DiCorte nondischargeable.

III.    **CONCLUSION**

The allegations of the Complaint are denied for the above stated reasons.  A separate Judgment will be rendered in accordance with this Memorandum Opinion.

---

[60] *Madison v. Williamson*, 410 B.R. 481, 484 (S.D. Tex. 2008), *In re Volbracht*, 276 Fed. Appx. 360, 361 (5th Cir. 2007).

[61] *Id.*at 484.

[62] *In re Vollbracht*, 276 Fed. Appx. 360, 361 (5th Cir. 2007). For example, self defense may result in an intentional injury but it is taken with a legal justification.